IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

**CYNTHIA BRUNNER,**                          Case 3:14 CV 1880

     Plaintiff,

     v.                                    Magistrate Judge James R. Knepp, II

**COMMISSIONER OF SOCIAL SECURITY,**

     Defendant.                            MEMORANDUM OPINION AND ORDER


## INTRODUCTION

Plaintiff Cynthia Brunner filed a Complaint against the Commissioner of Social Security seeking judicial review of the Commissioner's decision to deny disability insurance benefits ("DIB"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. § 405(g). The parties have consented to the exercise of jurisdiction by the undersigned in accordance with 28 U.S.C § 636(c) and Civil Rule 73. For the reasons stated below, the undersigned affirms the Commissioner's decision to deny benefits.

## PROCEDURAL BACKGROUND

Plaintiff filed for DIB on June 16, 2011 alleging an onset date of March 4, 1988. (Tr. 62). Plaintiff applied for benefits due to Attention Deficit Disorder ("ADD"), Attention Deficit-Hyperactivity Disorder ("ADHD"), depression, broken tailbone, lower left leg pain, and migraine headaches. (Tr. 62). Her claim was denied initially and upon reconsideration. (Tr. 62-74, 76-88). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (Tr. 111). Plaintiff, represented by counsel, and a vocational expert ("VE") testified at a hearing before the ALJ on February 6, 2013, after which the ALJ found Plaintiff not disabled. (Tr. 13-

25). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1); 20 C.F.R. §§ 404.955, 404.981.  Plaintiff filed the instant action on August 25, 2014. (Doc. 1).

## FACTUAL BACKGROUND

### *Personal Background and Testimony*

Plaintiff was born March 4, 1984 and was 27 years old at the time of her application. (Tr. 61). She was married at the time of the hearing but they lived at separate homeless shelters; she took the bus to hearing because her driver's license was suspended due to issues with child support. (Tr. 38). Plaintiff graduated from high school with the assistance of special education courses and had held numerous part time jobs but rarely for more than a few months at a time. (Tr. 39-41). Plaintiff claimed she was fired from many of these jobs because she was unable to keep up with the pace of the work environment. (Tr. 51).

She complained of pain from a broken tailbone when she stood or sat for too long, pain in her right elbow following a recent surgery, and leg cramps every other day. (Tr. 42, 45). She also testified she had depression, anxiety, and bipolar and schizoaffective disorders. (Tr. 43). She heard voices and had visions, which had recently been getting worse, crying spells, mood changes, and anxiety in crowds. (Tr. 43). She reported sleepiness and nausea from her medications and although they were somewhat effective at controlling her symptoms, she had just received increased doses. (Tr. 45-46). Plaintiff also stated she needed her husband to remind her to take her medications. (Tr. 45, 232).

She could follow simple instructions to operate a microwave, do the dishes, perform her personal hygiene, and use the computer at the library but she could not do laundry, manage a

2

checking or savings accounts, or grocery shop on her own. (Tr. 46-49, 230-33). She estimated she could only sit or stand for approximately twenty minutes at a time before having to move around and could only walk about a block before she would need a rest. (Tr. 49, 55). Her elbow also caused problems with pushing, pulling, lifting, and carrying; she estimated she could carry about five pounds. (Tr. 49-50).

***Education Records***

During her freshman year, Plaintiff was referred for a psychological consult to determine if she was eligible for special education courses. (Tr. 1069). On the Wechsler Intelligence Scale for Children III ("WISC-III"), her full scale IQ was measured 69. (Tr. 1070-71, 1082). While school psychologist, Donna Mihalec concluded Plaintiff was within the mentally deficient range of intelligence, she believed this was a measure of Plaintiff's frustration with her own limitations and not her intelligence. (Tr. 1071). A second non-verbal intelligence test, the TONI-3, was administered and Plaintiff scored in the average range, a result the psychologist believed more consistent with Plaintiff's actual abilities. (Tr. 1071). However, her reading, math, and written language skills were equivalent to those of a fourth grader. (Tr. 1071). Ms. Mihalec believed her classroom skills were compromised by her lack of persistence and low frustration levels. (Tr. 1071).

She had an Individualized Education Plan ("IEP") for the remainder of high school due to her ADHD and learning difficulties. (Tr. 1074-83). Plaintiff's high school transcript showed she struggled her freshman year but by her senior year she was receiving mostly A's and B's; however, she did not perform well on standardized tests. (Tr. 191-93).

***Relevant Medical Evidence***

*Physical*

In April 2004, Plaintiff reported chronic pain in her tailbone following a fall; she reported that it was diagnosed as a fracture; but records show it was only a contusion. (Tr. 457, 491). Over the next few years, Plaintiff was treated for multiple issues including pregnancy, abdominal pain, leg pain, and right arm pain in the emergency room. (Tr. 359-540, 617-28, 639-90, 813-955). A vascular study in 2005 showed no evidence of deep or superficial venous thrombus or vascular insufficiency in either leg. (Tr. 1087). In May 2007, she began physical therapy to address her back pain but only attended three of her scheduled eight sessions and was subsequently discharged from care for poor attendance. (Tr. 605, 608, 615-16). An August 2007 MRI revealed normal alignment in the thoracic spine, normal disc height, no stenosis, mild degenerative changes at L1-L2, and no disc herniation. (Tr. 801-02, 805).

In March and April 2010, she was seen in the emergency room with complaints of persistent pain and swelling in her left leg for the past four months; she was told to rest and discharged home. (Tr. 359-60, 553, 1021, 1147-63). In August and September 2010, Plaintiff complained of persistent left elbow pain resulting from a fall but the x-rays were unremarkable. (Tr. 581-83, 694-97, 702, 707-08). About six months later, she returned to the emergency room with complaints of severe leg cramps bilaterally that had lasted seven days, the cause of the pain was undetermined. (Tr. 569, 553-555).

A few months later she returned with the same complaints about her legs although she walked without difficulty. (Tr. 961, 982). Plaintiff continued to report left elbow pain and

swelling in September 2011 due to epicondylitis but x-rays remained normal. (Tr. 958, 1044). The doctor observed diffuse tenderness but no swelling and a full range of motion. (Tr. 958).

In early 2012, Plaintiff underwent an electromyography as related to her elbow pain and it revealed "possible left ulnar decompression". (1045-48). In February of that year, Plaintiff had surgery to correct her tardy left ulnar nerve palsy. (Tr. 1049). Following the surgery, she continued to complain of pain and paresthesias. (Tr. 1050-53).

*Mental*

From September 2007 through February 2010, Plaintiff received Celexa from Unison Behavioral Health for help controlling depression, impulsivity, and irritability. (Tr. 334, 337). At her initial visit, she denied hallucinations, feelings of hopelessness, sleep problems, impulsivity, and anxiety but complained of mild depression related to her children being taken away from her. (Tr. 335). On examination, she was alert, oriented, had normal psychomotor activity, good eye contact, normal speech, euthymic mood, broad affect, linear thought process, fair attention and concentration, intact recent and remote memory, and borderline intellectual functioning. (Tr. 336). Her intake form indicated she denied any history of learning disabilities even though the referral from Lucas County Children Services indicated she "completely lacked insight into why [Child Services] was involved with her case." (Tr. 349). Plaintiff was assessed a Global Assessment of Functioning ("GAF") score of 55[1] and diagnosed with dysthymic disorder. (Tr.

---

1. The GAF scale represents a "clinician's judgment" of an individual's symptom severity or level of functioning. American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders*, 32-33 (4th ed., Text Rev. 2000) (*DSM-IV-TR*). A GAF score of 51-60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id*.

5

337).  At follow-up appointments, she reported the medication was working well and she was much calmer. (Tr. 1141-44).

For approximately two months in spring of 2010, Plaintiff received medication from the Mildred Bayer Clinic. (Tr. 541-544). In November 2010, Plaintiff saw counselor Jim Buyakie, LPC, on referral from Michelle Heben, M.D. (Tr. 577). During the interview, she was untruthful and unmotivated to discuss her problems. (Tr. 576-77). Mr. Buyakie diagnosed Plaintiff with major depression and assigned a GAF score of 55. (Tr. 576).

In December 2011, Plaintiff was assessed at Unison Behavioral Health where she reported depression, anhedonia, irritability, problems with sleep, and easy frustration. (Tr. 1066). She also claimed to have begun hearing voices, mostly at nighttime and seeing shadows. (Tr. 1066). However, she denied suicidal ideation, hopelessness, mood swings, anxiety, mania, or panic attacks. (Tr. 1066). On examination, she was withdrawn yet cooperative, had spontaneous speech, dysphoric mood, no psychomotor activity, intact short and long-term memory, and fair insight and judgment. (Tr. 1067-68). She was diagnosed with major depression, ADHD, and a learning disorder; she was also assigned a GAF score of 45.[2] (Tr. 1068).

On February 13, 2012, she was seen by Habeeb Arar, M.D., after missing four appointments, because she needed more medication. (Tr. 1055). At this appointment she reported crying spells, depressed mood, and hearing voices but stated they "are a little farther." (Tr. 1055). She denied any medication side effects or changes in sleep, appetite, or weight. (Tr. 1055). Dr. Arar observed normal movement, good eye contact, cooperative mood, good hygiene, normal speech, constricted affect, goal-directing thought process, and good insight and

---

1. A GAF score of 41-50 indicates serious symptoms (e.g., suicidal ideation, sever obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job). *Id.* at 34.

judgment. (Tr. 1055). Dr. Arar diagnosed Plaintiff with dysthymic disorder and prescribed her Risperdal and Wellbutrin. (Tr. 1056).

A month later, Plaintiff returned and reported little change in her condition except that the voices were softer now; her mental status exam was unchanged as well. (Tr. 1057). She reported her medication was not helping much and Dr. Arar agreed to switch medications, she was prescribed Seroquel. (Tr. 1057). In May 2012, Plaintiff followed-up with Dr. Arar where she reported her mood was stable and the new medication was helping but she was still a bit anxious during the day. (Tr. 1060). Dr. Arar observed normal speech, movement, congruent affect, goal-directed thought process, normal attention and concentration, and good insight and judgment. (Tr. 1060-61).

In August 2012, Dr. Arar completed a medical source statement regarding Plaintiff's mental impairments. (Tr. 1063-65). He opined Plaintiff could remember, understand, and follow directions for simple tasks at least 80% of the time, maintain attention and concentration for two-hour periods less than 80% of the time but more than 2/3rds of the time, could not work in fast or externally imposed pace, would be 15-25% less productive than an unimpaired worker, and would have difficulty withstanding work stress such that she should work in unskilled or low-skilled work where frequent breaks would be needed. (Tr. 1063-65). Dr. Arar refused to opine on Plaintiff's ability to maintain a regular work schedule and attendance or on her ability to interact with others. (Tr. 1064).

On September 11, 2012, Plaintiff returned for medication management and follow-up at Unison where it was observed she was happy, with congruent affect, intact memory, attention, and concentration, linear thought process, good insight and judgment, and no auditory or visual

hallucinations. (Tr. 1166). The remainder of her visits that year and into 2013 showed largely unchanged mental status observations, no side effects of medication, and medication compliance. (Tr. 1167-72).

***Consultative Examiners***

On January 31, 2006, Plaintiff underwent a consultative examination with Gary Alan White, Ph.D., where she reported anxiety, anhedonia, and depression. (Tr. 291). She also reported a history of a learning disability and while she had a 3.6 GPA in high school, she attended special education classes. (Tr. 291-92). Her normal day consisted of getting the kids ready for school, giving her daughter her medication, doing housework, preparing dinner, and bathing the kids before bed. (Tr. 292). She frequently socialized with her mother and friends and had no problems with others in the community. (Tr. 291-92). Dr. White observed Plaintiff to be cooperative and friendly, with fair eye contact and social skills, and the ability to maintain attention throughout the interview. (Tr. 293). At this time, she denied hallucinatory involvement. (Tr. 293). Dr. White found her immediate memory was impaired as demonstrated by her inability to repeat back digits but her past memory was intact. (Tr. 294). According to the Wechsler Adult Intelligence Scale III ("WAIS-III"), Plaintiff had borderline intelligence with a full scale IQ of 73. (Tr. 294). Dr. White assigned Plaintiff a GAF score of 58.[3]

Dr. White concluded Plaintiff's ability to maintain attention, concentration, persistence, and pace was mildly impaired due to depression and her borderline intellectual functioning. (Tr. 296). He also concluded her ability to understand, remember, and follow instructions, as well as

---

3. A GAF score of 51-60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.*

her ability to relate to others were not impaired. (Tr. 296). Lastly, he opined she was mildly to moderately impaired in her ability to withstand work stressors and pressure due to her depression and intellectual abilities. (Tr. 296).

On March 6, 2013, Plaintiff underwent a second consultative examination with Jerome Zake, Ph.D. (Tr. 1174-82). Dr. Zake observed cooperative manner, appropriate motivation, normal articulation, blunt affect, dysphoric mood, adequate eye contact, no hostility or aggression, adequate concentration, impaired persistence, and low to average cognitive reasoning skills. (Tr. 1174-78). These were contrasted by Plaintiff's reports of anxiety, mood swings, crying spells, and auditory hallucinations. (Tr. 1174-78). Dr. Zake opined Plaintiff had dysthymic disorder, generalized anxiety disorder, mild psychotic disorder, and learning disorder; he assigned her a GAF score of 47.

He concluded despite her adequate understanding and recall, Plaintiff was impaired in carrying out instructions as evidenced by her difficulties with child services. (Tr. 1178). He also found she had adequate concentration, unremarkable pace, and questionable persistence; social anxiety; and increased symptomology when confronted with stress. (Tr. 1179). Dr. Zake opined Plaintiff had no restrictions in her ability to understand, remember, or perform simple instructions or make simple work related decisions, however she was moderately limited in her ability to carry-out complex instructions. (Tr. 1180). Dr. Zake based this conclusion on Plaintiff's inability to understand her custody issues; he believed this difficulty would translate into difficulties in other areas of life. (Tr. 1180). Next, he found her moderately impaired in her ability to interact with the public and markedly impaired in her ability to interact with co-workers and supervisors based on her self-reported social isolation and anxiety. (Tr. 1181).

***State Agency Reviewers***

Stephen Meyer, M.D. completed a review of Plaintiff's file on July 24, 2008 and opined on her mental RFC. (Tr. 329-32). He opined she was moderately limited in her ability to understand and remember detailed instructions but not significantly limited in any other categories of understanding or memory. (Tr. 329). Further, he found her moderately limited in her ability to carry-out detailed instructions and maintain attention and concentration for extended periods but again opined she had no limitations in performing simple work without supervision. (Tr. 329). Dr. Meyer concluded her ability to complete a normal workweek without interruption, interact appropriately with the general public, coworkers, and peers, respond appropriately to changes in work setting, and make plans independently of others were all moderately limited. (Tr. 330). Overall, Dr. Meyer opined Plaintiff was capable of simple and moderately complex routine tasks, performed at a reasonable pace with intermittent interaction with others although some assistance may be needed if the routine changes. (Tr. 332).

In August 2011, Edmond Gardner, M.D., reviewed Plaintiff's medical record and opined that she had no physical impairments which caused severe limitations. (Tr. 67). Caroline Lewin, Ph.D., concluded Plaintiff had mild restrictions in activities of daily living and social functioning, and moderate difficulties maintaining concentration, persistence, and pace. (Tr. 68). Dr. Lewin opined Plaintiff would be able to understand, remember, and follow simple and some moderately routine tasks but would have difficulty with complicated tasks due to her limited intelligence; she should remain in a static environment. (Tr. 70-71). She would also be limited to superficial contact with coworkers and the general public because of her history of impulsive behavior and anger issues. (Tr. 71).

10

On reconsideration, Aracelis Rivera, Psy.D., concurred with Dr. Lewin's opinion regarding Plaintiff's abilities. (Tr. 82-85).

### *ALJ Decision*

In May 2013, the ALJ found Plaintiff had the severe impairments of major depressive disorder, borderline intellectual functioning, and learning disorder, not otherwise specified; but these severe impairments did not meet or medically equal any listed impairment. (Tr. 15-18). The ALJ then found Plaintiff had the residual functional capacity to perform a full range of work at all exertional levels with the following non-exertional limitations: she could perform simple, repetitive tasks or moderately complex tasks that do not require interaction with the general public in a routine work setting with only occasional changes in work routine. (Tr. 19). But she could not have the pace of work dictated by an external source, such as an assembly line. (Tr. 19). She was also limited to only occasional interaction with coworkers and supervisors. (Tr. 19).

Based on the VE testimony, the ALJ found Plaintiff could perform work as an industrial cleaner, stores laborer, or a kitchen helper; and thus, was not disabled. (Tr. 24-25).

### STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings

"as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### STANDARD FOR DISABILITY

Eligibility for SSI is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process – found at 20 C.F.R. § 404.1520 – to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five

12

to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The court considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

**DISCUSSION**

Plaintiff argues the ALJ erred because he (1) failed to assign appropriate weight to the medical opinions in the record; and (2) did not consider if Plaintiff's impairments were equivalent to Listing 12.05C. (Doc. 17). Each argument will be addressed in turn.

### *Treating Physician Rule*

Plaintiff argues the ALJ did not give good reasons for assigning little weight to the opinion of psychiatrist Dr. Arar. (Doc. 17, at 14-18). Under the regulations, a "treating source" includes physicians, psychologists, or "other acceptable medical source[s]" who provide, or have provided, medical treatment or evaluation and who have, or have had, an ongoing treatment relationship with the claimant. 20 C.F.R. § 416.902.  An ongoing treatment relationship will exist when "medical evidence establishes that [plaintiff] see[s], or ha[s] seen, the source with a frequency consistent with accepted medical practice…" § 404.1502.

If a treating source relationship is established, the opinion of such treating source is usually given deference because it is based on a "detailed, longitudinal picture of [a plaintiff's] medical impairment(s)". *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96-2p, 1996 WL 374188. In contrast, the opinions of non-treating sources are not given

13

deference. § 416.927(d)(2); SSR 96-8p. Non-treating sources are physicians, psychologists, or other acceptable medical sources that have examined the claimant but do not have, or did not have, an ongoing treatment relationship with them. § 416.902.

Here, the record does not establish that Dr. Arar was a treating physician at the time he rendered his opinion on Plaintiff's ability to work; and thus, the ALJ was not required to provide good reasons for not affording it deference. The record shows Dr. Arar only saw Plaintiff three times over a six-month period before he provided the check-box opinion on her ability to work. (Tr. 1055, 1057, 1060, 1063). An ongoing treatment relationship does not exist because the evidence does not "establish[] that [Plaintiff] see[s], or ha[d] seen, the source with a frequency consistent with accepted medical practice." § 404.1502. *See e.g., Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 832 (2003); *Helm v Comm'r of Soc. Sec.,* 405 F. App'x 997, 1000 n.3 (6th Cir. 2011); *Daniels v. Comm'r of Soc. Sec*, 152 F. App'x 485, 491 (6th Cir. 2005); *Yamin v. Comm'r of Soc. Sec.,* 67 F. App'x 883, 885 (6th Cir. 2003). The treating physician rule is intended to grant deference to those medical sources that have a detailed and complete picture of the Plaintiff's medical history; that rationale does not apply here.

However, Dr. Arar is a non-treating source under the regulations; and the ALJ must evaluate and weigh his medical opinion based on certain factors. *Rabbers v. Comm'r Soc. Sec. Admin*., 582 F.3d 647, 660 (6th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). These factors include the length of treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source. *Id*. Additionally, the

14

regulations support medical opinions with thorough explanations that have considered all pertinent evidence. § 404.1527(c)(3).

The ALJ gave Dr. Arar's opinion little weight because the check-box conclusions were not supported by explanations or the objective evidence, and the ALJ believed it to have been completed as an accommodation for the Plaintiff. (Tr. 22). Setting aside the ALJ's belief regarding Dr. Arar's motives, the former two reasons are adequate explanations of why more weight was not given to Dr. Arar's opinion. First, the opinion was internally inconsistent with Dr. Arar's own observations, for example at two out of his three sessions with Plaintiff he found her attention and concentration were normal. (Tr. 1058, 1061). Yet, he opined she would only be able to maintain attention and concentration between 66-80% of the time because she "has poor concentration and short attention spans". (Tr. 1063).  Second, Dr. Arar only provided vague explanations for two of his restrictions and none at all for the others. (*See* Tr. 1063-65). When asked to explain the support for his conclusion that Plaintiff would have difficulty tolerating the stress of even routine work, Dr. Arar wrote "patient has problem to cope with stress." [sic]. (Tr. 1065). It is this type of conclusory explanation and opinion that an ALJ is free to devalue. *See White v. Comm'r of Soc. Sec.,* 572 F.3d 272, 286 (6th Cir. 2009) (conclusory statements from physicians, without support from specific documents, are a valid reason for discounting an opinion). The ALJ did not err in refusing to grant more weight to an opinion that was almost entirely unsupported by explanation and lacked a basis in the available record.

Plaintiff next challenges the weight given to the opinions of state agency reviewer, Stephen Meyer, M.D., and consultative examiner, Jerome Zake, M.D., claiming their opinions were not substantial evidence upon which to base the ALJ's decision. (Doc. 17, at 18-22).

15

As to Dr. Meyer's opinion, Plaintiff claims it should not have been given significant weight because the opinion was rendered without a complete medical record. (Doc. 17, at 19). The ALJ knew Dr. Meyer's opinion covered only a finite period because Dr. Meyer specifically cited to the dates of the examinations on which he based his opinion, so there was no confusion on what evidence he reviewed. Certainly, it is true that an opinion given in 2008 would not contain more recent medical records. However, that alone is not enough to discount an opinion. *See McGrew v. Comm'r of Soc. Sec.*, 343 F. App'x 26, 32 (6th Cir. 2009) (finding an ALJ does not err by relying on a prior opinion as long as the remainder of the medical record is considered to take into account any more recent relevant changes in condition).

It is apparent from a review of the ALJ's decision that he summarized and considered all the evidence of record, including her more recent treatment records. (Tr. 19-23). Importantly, her more recent treatment records do not display notably different symptoms than those summarized by Dr. Meyer in 2008; at both times she complained of depression, anxiety, and mood swings, the only difference in later years were reports of auditory hallucinations, however all of her symptoms were improved by medication. (*See* Tr. 331, 1043, 1055, 1057, 1060, 1166, 1167-72). It should be noted Plaintiff argues Dr. Meyer may not have had access to her school records, yet Dr. Meyer makes explicit reference to "school testing" in his opinion; regardless, Plaintiff fails to explain how this would have altered his opinion. (Tr. 331). The ALJ did not err by granting significant weight to Dr. Meyer's opinion when a review of the record shows her condition had not substantially changed and the ALJ's opinion considered more recent evidence.

Further proof the ALJ considered recent evidence is the great weight he gave to the opinion of Jerome Zake rendered in 2013. Plaintiff incorrectly asserts that the ALJ ignored Dr.

Zake's opinion with regard to Plaintiff's social limitations; however, the RFC explicitly states she is not to have interaction with the general public and is to have only occasional interaction with coworkers or supervisors. (Doc. 17, at 20-21); (Tr. 19). These restrictions are consistent with Dr. Zake's comments that she is anxious around others and Plaintiff's self-reported social isolationism. (Tr. 22, 1180-81).

Plaintiff next argues that Dr. Zake's opinion is "not entirely inconsistent" with that of Dr. Arar's and thus presumably, should be given the same little weight. (Doc. 17, at 19). This argument completely lacks merit. It is true Dr. Zake and Dr. Arar made similar observations on mental status examination, however, the difference is the conclusions drawn from those observations. (*See* Tr. 1063, 1174-81). As discussed above, Dr. Arar's opinions on Plaintiff's ability to work were neither explained nor tied to his observations about Plaintiff's condition. On the contrary, Dr. Zake specifically explained the basis for his opinion with reference to Plaintiff's comments during their session. (Tr. 22, 1174-81).

Plaintiff's mere disagreement with the ALJ's conclusions is not enough to overcome substantial evidence. *See Jones,* 336 F.3d at 477 (6th Cir. 2003). The ALJ's conclusions were based on the evidence in the record and the supportability of the opinions, i.e. those that were well explained and supported with citation to the record were accorded more weight than conclusory opinions. *See Rabbers,* 582 F.3d at 660; *see also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 514 (6th Cir. 2010). Thus, there is no error in the weight given to the opinions of Drs. Arar, Meyer, and Zake.

***Listing 12.05C***

Plaintiff next argues the ALJ erred by failing to address whether Plaintiff's condition was medically equivalent to Listing 12.05C. (Doc. 17, at 8-12). The ALJ addressed the issue as follows:

> Finally, the "paragraph C" criteria of listing 12.05 were not met because the claimant did not have a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.

(Tr. 18). Plaintiff alleges this is an insufficient explanation, especially since it does not address the fact that she did have a full scale IQ score of 69 in 2000.

A plaintiff can demonstrate she is disabled by presenting "medical findings *equal in severity to all the criteria* for the one most similar listed impairment." *Sullivan v. Zebley*, 493 U.S. 521, 531 (1990) (emphasis added); 20 C.F.R. § 404.1526(a). "Medical equivalence must be based on medical findings" and "must be supported by medically acceptable clinical and laboratory diagnostic techniques." §404.1526(a). In order to determine whether a plaintiff's impairments are medically equivalent to a listing, the ALJ may consider all evidence in a plaintiff's record. § 404.1526(c).

The diagnostic description of intellectual disability in 12.05 refers to "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." Part 404, Subpt. P, § 12.05. To demonstrate intellectual disability, a plaintiff must establish three factors to satisfy the diagnostic description: 1) subaverage intellectual functioning; 2) onset before age twenty-two; and 3) adaptive-skills limitations. *See Hayes v. Comm'r of Soc. Sec.*, 357 F. App'x 672, 675 (6th Cir. 2009); *Daniels v.*

18

*Comm'r of Soc. Sec.*, 70 F. App'x 868, 872 (6th Cir. 2003). Beyond these three factors, a plaintiff must also satisfy "any one of the four sets of criteria" in listing 12.05. *See Foster v. Halter,* 279 F.3d 348, 354 (6th Cir. 2001). Pertinent here, 12.05C requires a plaintiff to have a valid, verbal, performance, or full scale IQ of 60-70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function. Part 404, Subpt. P, § 12.05C.[4]

There is no "heightened articulation standard" in considering the listing of impairments; rather, the court considers whether substantial evidence supports the ALJ's findings. *Snoke v. Astrue,* 2012 WL 568986, at *6 (S.D. Ohio) (quoting *Bledsoe v. Barnhart,* 165 F. App'x 408, 411 (6th Cir. 2006)). However, a reviewing court must find an ALJ's decision contains "sufficient analysis to allow for meaningful judicial review of the listing impairment decision." *Snoke,* 2012 WL 568986, at *6; *see also May,* 2011 WL 3490186, at *7 ("In order to conduct a meaningful review, the ALJ's written decision must make sufficiently clear the reasons for his decision."). The court may look to the ALJ's decision in its entirety to justify the ALJ's step-three analysis. *Snoke,* 2012 WL 568986, at *6 (citing *Bledsoe,* 165 F. App'x at 411).

In reviewing the ALJ's opinion, the Court finds the ALJ erred in his lack of explanation regarding the section C criteria. However, Plaintiff has not established the other three diagnostic description factors under Listing 12.05 and therefore, the ALJ's finding that Plaintiff did not meet Listing 12.05C is supported by substantial evidence.

In support of her argument, Plaintiff directs the Court to allegedly qualifying IQ scores. Indeed, in 2000, school psychologist Ms. Mihalec found Plaintiff had a full scale IQ score of 69.

---

4. The Commissioner does not dispute that Plaintiff has a mental impairment, depression, which imposes an additional and significant work-related limitation. (Doc. 20, at 11).

(Tr. 1071).  The ALJ did not explain why he did not consider the 2000 score valid (although the assumption can be made it was because Dr. White determined Plaintiff had a full scale IQ of 73 in 2006). (Tr. 21, 294-96). But Plaintiff asserts even the score of 73 is within the standard error of measurement so as to also make it a listing qualifying score. (Doc. 17, at 10). Because the ALJ did not discuss the discrepancy between these scores or even mention their existence in his conclusion regarding the section C criteria, he erred.

This error is relevant because Plaintiff has other severe impairments, mainly depression, which causes significant work-related impairments. (Tr. 15). However, even accepting both IQ scores as qualifying, the analysis does not stop with the section C criteria. *See Blanton v. Soc. Sec. Admin.*, 118 F. App'x 3, 7 (6th Cir. 2004) ("[T]wo IQ scores of 70, without more, does not satisfy the requirements of Listing 12.05(C)."). Indeed, Plaintiff must also establish the "additional factors" in the diagnostic description – 1) subaverage intellectual functioning; 2) onset before the age of twenty-two; and 3) adaptive skills limitations. Each factor is addressed below.

First, Plaintiff must show subaverage intellectual functioning. A review of the record and the ALJ's opinion indicate that Plaintiff has consistently been found to be in the borderline intellectual functioning range. (*See* Tr. 20-21, 294, 336, 1069-71, 1174-80). At school she performed well with the assistance of an IEP; her teachers noted she made a good effort and completed her work independently; and the majority of her grades were A's and B's. (Tr. 21, 191-93, 1073-83). *See Hayes v. Comm'r of Soc. Sec.*, 357 F. App'x 672, 677 (6th Cir. 2009) (finding poor academic performance alone is not sufficient to warrant a finding of subaverage intellectual functioning before the age of 22). She denied a history of learning disorders (Tr. 20,

349) and was generally found to have low average or average cognitive functioning (Tr. 294-96, 336, 1066, 1069-71, 1174-78). Further, at the same time Plaintiff received a score of 69 on the WISC-III, she was administered the TONI-3 and found to be of average intelligence. (Tr. 1071). Indeed, school psychologist Ms. Mihalec opined Plaintiff's academic difficulties resulted from lack of persistence and not her intellectual abilities. (Tr. 1071). Importantly, Plaintiff has never been diagnosed with intellectual disability. Rather, Plaintiff has consistently been placed in the borderline range of intellectual functioning; this coupled with her relatively good academic record support the ALJ's conclusion that she does not meet the requirements of Listing 12.05.

As Plaintiff needs all three limitations to meet or equal the listing, the Court need not address Plaintiff's arguments relating to deficits in adaptive skills because of her failure to meet the prerequisite of subaverage intellectual functioning. In sum, while the Court finds the ALJ's analysis of Plaintiff's potentially qualifying IQ scores was insufficient, the ALJ's ultimate conclusion finding Plaintiff failed to medically equal Listing 12.05C was not. This is because the ALJ adequately discussed and supported with substantial evidence the reasons Plaintiff did not satisfy the diagnostic criteria. Where as here, remand would be an "idle and useless formality"; the Court is not required to do so. *See Kobetic v. Comm'r of Soc. Sec.*, 114 F. App'x 171, 173 (6th Cir. 2004).

For the above stated reasons, the undersigned finds the ALJ's determination is supported by substantial evidence, as Plaintiff has failed to satisfy the required severity to equal Listing 12.05C.

## CONCLUSION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying DIB is supported by substantial evidence. The undersigned therefore affirms the Commissioner's decision.

s/James R. Knepp II
United States Magistrate Judge
